## THE SIAMESE PRINCE.

### (District Court, S. D. New York, January 11, 1913.)

SHIPPING (§ 132*)—LOSS OF CARGO IN LOADING—LIABILITY OF VESSEL.

While a bundle of rubber, consisting of six bales slung to the boom of respondent steamship, was being hoisted on board from a lighter in the port of Bahia, the lighter lurched from the ship, owing to the swell, and the bundle struck her rail and was lost in the sea. The ship furnished the tackle and winchman to operate it and a man who stood at the side and signaled the winchman to hoist when told by the men on the lighter, who, with the lighter, were employed by the shipper. The bill of lading exempted the ship from liability for risk of "transhipment from or to craft." *Held*, that this placed the burden of proof on the shipper, and that there was no evidence to show negligence on the part of the ship; the negligence, if any, being that of the lightermen in not steadying the sling as it rose.

[Ed. Note.—For other cases, see Shipping, Cent. Dig. §§ 471–487; Dec. Dig. § 132.*]

In Admiralty. Suit by Adolph Hirsch, trading as Adolph Hirsch & Co., against the steamship Siamese Prince. Decree for respondent.

T. Catesby Jones, of New York City, for libelant.
John M. Woolsey, of New York City, for respondent.

LEARNED HAND, District Judge. This is an action against the steamer for the loss of eight bales of rubber while being shipped from a lighter to the steamer itself at Bahia on the night of the 3d day of January, 1912. The rubber was a part of a consignment of 584 bales which had been loaded into a lighter at Bahia and brought alongside the steamer, which was two or three miles out. In Bahia all loading is done by lighters, as it has no wharves, and the steamer was riding on one anchor off shore, as stated. The harbor of Bahia for about 90 degrees is open to the sea, and there is continuous swell which varies with

---

the tide and wind, but is in nearly all conditions sensible on all smaller vessels. On the night in question the swell was not severe, but enough to cause the lighter to range considerably at the side of the steamer. The steamer herself was apparently substantially steady. The lighter was fastened fore and aft by two lines to the bollards of the ship, but there was no attempt to keep her from ranging off and on to the ship's side. The loading was being done from the No. 2 hatch of the ship, from which a boom had been run over the ship's side, lowered enough so as to plumb directly over the open hatch of the lighter itself. This hatch was probably about 20 feet wide, and went from side to side of the lighter itself. Possibly it was a trifle shorter. The method of loading was to sling some six or eight bales of rubber onto the falls of the boom, then to hoist away until the bundle got to the height of the deck, after which it was taken on board and loaded into the ship's hold. The lighter was furnished by the shipper, and the ship had nothing to do with it. Aboard the lighter were men charged with the duty of making up the slings. This hold was apparently a shallow affair—indeed, so shallow that a man standing in it had his head above the deck. The coaming on the outboard sides of the hatch consisted of the lighter's own rail. On the ship the loading at the time in question was in charge of the mate, but the only eyewitness was an apprentice, who tallied the cargo as it came over. There was a man on the steam winch, and a man at the gangway, or the place where the rail had been, as it was taken down for this purpose. The men in the hold of the lighter would give the signal to the gangwayman when they wished the ship to heave away, and he would repeat it to the winchman. Then the bundle would be heaved up. The particular bundle in question was made up as the others had been made and the lighterman gave the signal to the gangwayman, who repeated it to the winchman. The winch was started and the bundle was raised. Whether at that time it was swinging or not cannot be ascertained, except by inference, but this much is certain: That, as it reached about the height of the lighter's deck, the lighter gave a sudden lurch away from the ship of about two or three feet, and perhaps rose at the same time; the coaming struck the bundle, detached it from the sling, and the bales fell overboard. They were not recoverable, and no effort was made to recover them.

The bill of lading under which both parties concede the shipment is to be controlled contained, among its exemptions, the following: "Risk of lighterage to or from vessel, risk of craft or hulk, or storage or transhipment, or transhipment from or to craft." I do not think that any of these has any application to this case, except the last words "transhipment from or to craft," but this covers exactly the situation of these bales in my judgment. Therefore we start with an exemption in favor of the ship. Now Mr. Jones urges on me that this exemption is void in any case, for the reason that it is not by its own terms limited to exemptions, in the absence of negligence, that a general exemption, including negligence, would be void in any event; and, as the ship has drawn its own bill of lading, I should not save it in respect of those conditions with which it would be valid, had it been expressly so limited. On that question I express no opinion, because it has been de-

cided by Judge Noyes on exceptions to an answer in another case setting up the same defense. I shall therefore overrule that.

The sole question in the case is whether the libelant has shown enough negligence to take the case out of the exemption. Now Mr. Jones insists that it is enough in this case to call for an explanation that the accident was one which happened apparently while everything was going in the usual way, and particularly that the person who has all the facts ought to show them and show why there was no negligence. In other words, he invokes in this case the doctrine of res ipsa loquitur. Perhaps if I agreed with him on the facts I might agree with him on the law. I do not think it is necessary to pass on that question, because it does not seem to me that the ship was in entire control of the situation. The testimony of the apprentice, Jameson, who was the only witness who saw what happened, is quite clear to the effect that the lightermen gave the word to the gangwayman to hoist. Mr. Jones thinks, and I am inclined to agree with him, that probably this bundle must have been swaying a bit for the lighter to strike it. Certainly, if we are to take the dimensions which the witnesses gave, there must have been considerable swaying back and forth of the bundle at the time—a swaying of four or five feet on each side. He says that, when the gangwayman saw that the bundle was swaying in this way, he ought to have stopped the winch and let the bundle steady itself, before it could be hauled up. Where I differ with him is that I think the duty of steadying the bundle he was quite right in leaving to the lightermen themselves. It is conceded in the case that the ship is not responsible for what went on in the lighter, and that the libelant or his agents chose it. It is also, as I have said, the fact that the lighter had assumed the direction of the hoisting. I think they were in quite as good a position, if not better, to determine what was the proper time to hoist away and how far to hoist as the gangwayman; in any event, it was within the duties which were intrusted to them by the libelant. If the gangwayman had interfered, I think he would have gone out of the proper limitation of his own duties. Probably what happened was that the bundle had been taken from one side of the lighter, and, as it was hoisted, the lighterman did not steady it sufficiently. They, at the time of giving the order to the gangwayman, could have said to hoist a few feet so as to clear the bottom of the hold, and then they could have steadied it. I do not think that the gangwayman should be charged with that duty. If he should not, there is nothing in the ship which was negligent, and it was entitled to its exemption.

The testimony makes it quite clear that there was nothing unusual in the range of the lighter at the time when this bundle was struck. I think it also quite clear that it is utterly impossible, under the circumstances, to foretell in the least degree just when a lurch of this sort would come. Under most circumstances, the range of the lighter was too short to do any damage, but whether in a given case or not the likelihood of damage was proximate was, as I have already stated, a question which rested primarily, and indeed altogether, in the judgment of the lightermen themselves.

The result of this is therefore that the libel should be dismissed.